# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# WESTERN DIVISION

| | | |
|---|---|---|
| John Dolan, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 15 CV 50185 |
| | ) | Magistrate Judge Iain D. Johnston |
| Carolyn W. Colvin, Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff John Dolan brings this action under 42 U.S.C. §405(g), challenging the denial of social security disability benefits.

On February 1, 2012, plaintiff filed his applications, claiming a disability due to back pain and psychological problems. On December 11, 2013, a hearing was held before an administrative law judge ("ALJ"). Plaintiff testified that he was 46 years old and was living with his sister and, before then, had moved often. R. 33 ("I'm basically homeless. I've been bouncing around home to home sleeping on couches for the better part of the last couple of years.").

The ALJ asked about plaintiff's work history. He worked in car sales in 1998, but was mostly self-employed doing odd jobs from 1996 to 1999. He tried to start his own construction business at one point. His longest job was telemarketing for a dating service from 2002 to 2008. It became "very grueling" sitting for eight hours a day and he had to stop. R. 35. Afterwards, he tried doing "small remodeling type jobs and you know, handyman jobs and stuff, but there's just not any work out there." R. 37.

The ALJ next asked plaintiff about his other problems such as anxiety, chronic obstructive pulmonary disease ("COPD"), and depression. She posed a hypothetical question,

1

asking which of these three ailments plaintiff would "erase" if he could magically do so. R. 40. Plaintiff found the question difficult, calling it a "really tough decision" and stating that he would "probably" pick "depression and the bipolar" because he had "no social circle any longer." R. 41. Plaintiff testified that he started taking a new bipolar medication prescribed by a doctor at the Crusader Clinic, but that he had been "on meds off and on for [his] entire adult life." R. 43, 46. The ALJ asked whether the medications helped. Plaintiff responded: "it's like a roller coaster. Some days they work, some days I don't feel like they're doing much of anything." R. 46.

The ALJ asked plaintiff what treatments plaintiff had received for his back pain. He stated that his recent doctor told him that he could receive cortisone shots (which cost between $1,200 and $1,500 a shot) and that he also was a "candidate for surgery." R. 56. Plaintiff stated that he did not pursue these options because he did not have insurance or the ability to pay for them. The ALJ asked plaintiff what his pain level was when he woke up and his medications had worn off. Plaintiff stated the following: "It's definitely [] a 10, yeah, it's a 10." R. 58. The ALJ seemed to find this answer unbelievable as she stated the following: "I mean, maybe you don't get the way it works. 10 pain is when the 10 is so unbearable that if they said, we have a pill that will stop the pain, but you will cease to breathe." R. 58. Plaintiff responded that he would not take such a pill because that would be suicide, and then reaffirmed his answer that he sometimes suffered a 10-level pain. He admitted that he had not been to the emergency room recently. The ALJ asked whether a doctor had prescribed or given plaintiff a cane or a walker. Plaintiff again raised his lack of insurance: "I found that without any kind of insurance[,] without any kind of medical card, it seems that the doctors want to give you the limited possible care[.]" R. 59.

The ALJ next asked about plaintiff's COPD and whether he was still smoking. Plaintiff testified that he had been trying to cut down and finally quit altogether a month before the

2

hearing. The ALJ questioned plaintiff about how he had been able to quit, and plaintiff stated that he took Wellbutrin and chewed gum as a substitute.

The ALJ then asked about a reference in a medical record about plaintiff doing home repair on March 23, 2009 and then another reference to him carrying 90-pound bundle of shingles up to a roof.  When questioned as to how he could do this work with a bad back and breathing problems, plaintiff stated that he probably split the 90-pound bundle in half and that he sometimes had good days and probably tried to do things he should not have been doing. Plaintiff admitted that, during 2009 to 2011, he tried doing various jobs to support himself. In 2012, he worked a couple of months for a dating service in Schaumburg but it was too painful with the time sitting on the job plus sitting during the long commute. The ALJ brought up the fact that plaintiff lost his driver's license many years ago because of two DUIs. Plaintiff stated that his license was never returned because he could not afford the $3,000 it would cost to pay lawyers.

On April 18, 2014, the ALJ found plaintiff not disabled.  The ALJ found that plaintiff had three medically determinable impairments—back pain, bipolar disorder, and ADHD—but then found that none of them qualified as severe at Step 2 of the five-step process. In this appeal, plaintiff argues that the ALJ erred by essentially imposing a too strict standard at this early stage of the five-step process. This Court agrees. In several recent cases, the Seventh Circuit has emphasized that the Step 2 inquiry is only "a *de minimis* screening for groundless claims." *See Meuser v. Colvin*, __ F.3d __, 2016 WL 5682715, *4 (Oct. 3, 2016); *O'Connor-Spinner v. Colvin*, 832 F.3d 690, 697  (7th Cir. 2016) ("The Step 2 determination is 'a *de minimis* screening for groundless claims' intended to exclude slight abnormalities that only minimally impact a claimant's basic activities."); *Thomas v. Colvin*, 826 F.3d 953, 960 (7th Cir. 2016). In *Meuser*,

the Seventh Circuit remanded because the ALJ, in considering whether schizophrenia was a severe impairment, applied a too demanding standard at Step 2 by "conflat[ing] Steps 2, 4, and 5." 2016 WL 5682715 at *4. Similarly, in *O'Connor-Spinner*, the Seventh Circuit remanded, holding that a diagnosis of "major depression, recurrent severe" satisfied the test at Step 2. 832 F.3d at 697 ("[w]e have not found a published opinion from any circuit in which an ALJ declared that major depression was not a severe impairment"). The Court noted that it would be "nonsensical" to hold otherwise, given that such a diagnosis "by definition" shows that the claimant had "significant distress." *Id.* Based on these cases alone, plaintiff here would have a good argument for remand because, among other things, the psychological consultant Dr. Renzi diagnosed plaintiff with major depression, albeit moderate and not severe. R. 472.[1]

In any event, this Court need not decide this case on this ground alone because it agrees with plaintiff's three other arguments for remand, which are the following: (1) the ALJ improperly analyzed the objective medical evidence; (2) the ALJ conducted a skewed credibility determination, and (3) the ALJ cursorily rejected the State Agency medical opinions. These arguments correspond to the three main parts of the ALJ's analysis. *See* R. 16-19.

**I.    Objective Evidence**

In the first part of her analysis, the ALJ considered the objective medical evidence, discussing (separately and in the following order) plaintiff's back pain, COPD, and depression. This was the key part of the opinion as it was used to later discredit the opinions of the State Agency doctors and to undermine plaintiff's credibility. However, the ALJ's analysis is flawed because the ALJ cherry-picked the evidence, inaccurately summarized medical records, and interpreted technical medical findings without the benefit of a medical opinion.

---

[1] The Government has not made any harmless error argument.

These errors can be best illustrated by looking more closely at the analysis of plaintiff's back pain. The ALJ devoted two paragraphs to this issue. Here is the entire reasoning:

> The medical evidence shows a history of L5-S1 degenerative changes, documented by MRI findings from April 2010 (5F/30), for which he was treated with pain medication. His back pain appears to have resolved by August 2010, as there is no mention of pain at that time (5F/10) and there is no recurrence mentioned until March 2012. At that time, when he presented to the local clinic stating that he had fallen down the stairs two weeks earlier. Although he reported pain in his back at "9/10," x-ray imaging was negative and clinical examination was normal with full range of motion, normal gait and posture, and intact strength and sensation (5F/4).
>
> In the most recent clinic note that mentions back pain, he reported that he was "doing okay and stable" with no new symptoms or problems (18F/3). The most recent MRI findings from March 2013 show no significant changes compared to the April 2010 findings with only "mild" lumbar canal stenosis and "mild" impingement of the existing nerve root at L5-S1 (15F).

R. 16. To summarize, these paragraphs contain an overarching theory supported by five data points (two MRIs and three medical visits from 2010 until 2013). The implicit theory is that plaintiff's initial problems in 2010, as documented by the first MRI, were later "resolved." The five data points consist of the following: (1) an April 2010 MRI report by Dr. Mark Traill (R. 394); (2) notes from an August 2010 visit with Debra Hysell, a nurse practitioner at Crusader Clinic (R. 374); (3) notes from a March 2012 visit to the same nurse (R. 368); (4) a March 2013 MRI report by Dr. Nitin Shirodkar (R. 497); and (5) notes from a December 2013 visit with Dr. Basil Jaradah at Crusader.

A central problem with this analysis—one that should not be lightly dismissed—is that the ALJ cherry-picked the evidence to fit the theory. This fact may not be obvious in a surface reading of the two paragraphs, but it becomes apparent when the ALJ's descriptions are checked against the source documents she relied on. To put it more bluntly, the ALJ engaged in an erroneous and questionable slanting of the evidence. Consider the August 2010 visit to the Crusader nurse. In the opinion, the ALJ claimed that during this visit plaintiff made "no mention

5

of pain at this time," a fact then used to bolster the larger theory that the back problems were "resolved." However, the notes from this visit state that plaintiff, who was seeing the nurse for a follow-up regarding a hand rash, nonetheless stated that he "[a]lso has questions re how to manage back pain." R. 374. This statement directly contradicts the ALJ's categorical claim that plaintiff did not "mention" back pain during this visit.

This was not the only questionable summary from these two paragraphs. In her summary of plaintiff's March 2012 visit with this same nurse, the ALJ stated that plaintiff reported strong back pain (9 out of 10) but then noted that the "x-ray imaging was negative" and the "clinical examination was normal." The implication was that plaintiff was malingering. But again a review of the source document presents a different and more nuanced picture. For one thing, the Court cannot tell what statement in these notes supports the claim that the "x-ray imaging was negative." There is a vague reference stating "Diagnostic Imaging: Lumbar 2-3 Views," but it has no accompanying explanation. R. 368. More broadly, despite some normal findings on physical examination, the nurse still diagnosed plaintiff with "Degenerative disc disease-lumbar," prescribed Tramadol,[2] and advised him to continue using heat and ice, among other things. *Id.* These statements suggest that the nurse believed plaintiff's pain allegations. But these facts, which undermine the ALJ's theory, were absent from the ALJ's summary.

Yet another example (and we are still just looking at these two paragraphs) is the ALJ's summary of the final visit on December 2013 with Dr. Jaradah. The ALJ described this visit as follows: "In the most recent clinic note that mentions back pain, [plaintiff] reported that he was **'doing okay and stable' with no new symptoms or problems** (18F/3)." R. 16 (emphasis added). Compare this statement with the complete summary in Dr. Jaradah's notes:

---

[2] Tramadol is used to relieve moderate to moderately severe pain.

6

> 46 YO M with chronic low back pain problem due to intervertebral disk disease presented for a follow up visit, [he] was supposed to start Percocet 10 instead of the Norco in addition to methadone, pt stated that he did not tolerate the Percocet and it made him drowsy/sleepy [and] it was very heavy on him. [H]e had [a] couple refills left on his previous Norco script so he filled it 1 month ago and quit taking the Percocet. [O]therwise he is **doing okay and stable** and **no new symptoms or problems** noticed.

R. 538 (emphasis added).³ The ALJ seized on the last sentence but ignored the larger import of this statement. The first sentence states clearly that plaintiff was reporting "chronic low back pain." Further, Dr. Jaradah diagnosed plaintiff with degenerative disc disease and also changed his pain medications, indicating that he believed that pain was still a problem for plaintiff. "Otherwise," the ALJ's presentation of this note is accurate.

In addition to these factual errors, which allowed the ALJ to puff up the narrative that plaintiff's back problems had disappeared, the ALJ also improperly analyzed the medical evidence by relying on layperson hunches. As discussed below, the ALJ disagreed with the opinions of the State Agency doctors. The ALJ also did not call a medical expert at the hearing. Still, the ALJ proceeded to draw conclusions from the technical medical evidence. This violates a central tenet of disability law that an ALJ should not "play doctor." *See Engstrand v. Colvin*, 788 F.3d 655, 660-61 (7th Cir. 2015); *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir.1996) ("ALJs must not succumb to the temptation to play doctor and make their own independent medical findings.").

A key example of the ALJ playing doctor is her conclusion that the March 2013 MRI showed "*no significant changes* compared to the April 2010 findings with *only* 'mild' lumbar canal stenosis and 'mild' impingement of exiting nerve root at L5-S1." R. 16 (emphasis added). However, there is nothing in this second MRI report indicating that Dr. Shirodkar compared the

---

³ Percocet and Norco are hydrocodone and acetaminophen combinations used to relieve moderate to moderately severe pain.

7

two MRIs or that he believed there were no significant changes. Moreover, although this second MRI report refers in places to "mild" findings, such as "mild lumbar canal stenosis" and "[m]ild spondylotic changes," these are medical terms that are not obvious to a layperson, and thus need interpretation by an expert. *See, e.g., Israel v. Colvin*, ___ F.3d ___, 2016 WL 6135856, *6 (7th Cir. Oct. 21, 2016) ("Because no physician in the record has opined on whether these results [from two MRIs] are consistent with Israel's claim of disabling pain, and because the reports are replete with technical language that does not lend itself to summary conclusions, we cannot say whether the results support or undermine Israel's claim."). In sum, the Court finds that the ALJ's analysis of the objective evidence was incomplete and erroneous.

## II. Credibility

In the second part of the opinion, the ALJ concluded that plaintiff's testimony was not credible because he made inconsistent statements, worked after the onset date, and received limited treatment. These arguments suffer from many of the same problems identified above.

As for the inconsistent statements, the ALJ faulted plaintiff for not revealing at the hearing that he had been convicted of aggravated battery and for allegedly giving conflicting answers to two different medical providers about the extent of his drinking. As an initial matter, contrary to the ALJ's assertion that these statements were "relevant to the issue of disability," the Court cannot see how they are connected to the specific ailments at issue. For example, no argument has been made that plaintiff's alcohol use had any significant effect on an alleged impairment. The ALJ's reliance on these points, therefore, comes close to being an impermissible "examination of [a claimant's] individual's character." Social Security Ruling 16-3p, 81 Fed. Reg. 14166, 14167, 14171 ("our adjudicators will not assess an individual's overall character or truthfulness in the manner typically used during an adversarial court litigation. The

8

focus [] should not be to determine whether he or she is a truthful person."); *Cole v. Colvin*, 831 F.3d 411, 412 (7th Cir. 2016) (ALJs should not be "in the business of impeaching claimants' character," although they may still assess "the credibility of pain *assertions* by applicants") (emphasis in original). In addition, as a factual matter, the Court is again concerned about whether the ALJ fairly interpreted the record and whether these are even inconsistencies. In particular, the ALJ stated that plaintiff "admitted at [the] hearing to having had past convictions for driving under the influence but conveniently neglected to mention his past incarceration for aggravated battery." R. 17. The insinuation is that plaintiff lied. However, in reading the hearing transcript, the Court did not find any instance where plaintiff was asked about convictions generally or where he arguably should have volunteered such information. It is true that the issue of his two DUIs was raised, but it was the ALJ who asked about them and did so in the specific context of understanding why plaintiff could not drive to work. R. 68.

The ALJ's second credibility rationale—that plaintiff worked after the onset date—rests on a partially developed factual record, as well as on a questionable premise. The ALJ noted that plaintiff worked to some degree, doing side jobs in construction or home repair and working for a dating service for a time in 2012. However, it is unclear *how long* he held these jobs or even whether they were one-day, one-off type jobs. Even the ALJ described them as being "side" jobs that were "off and on." And it is not as if plaintiff denied doing such work. At the hearing, he explained that he tried to work out of necessity, but that these efforts were mostly unsuccessful. The ALJ did not give consideration to these explanations. As the Seventh Circuit has recognized, "even persons who *are* disabled sometimes cope with their impairments and continue working long after they might have been entitled to benefits." *Shauger v. Astrue*, 675 F.3d 690, 697 (7th Cir. 2012) (emphasis in original). Here, there is evidence that supports such a theory. For

9

example, although plaintiff tried working on a roofing job lifting heavy shingles, he ended up in the emergency room. Likewise, although he worked at a dating service in 2012, he quit after two months because the sitting from the job and long commute were too painful. *Cf. Czarnecki v. Colvin*, 595 Fed. Appx. 635, 644 (7th Cir. 2015) (faulting the ALJ for relying on fact that claimant was waitressing and climbing a ladder because the ALJ "did not mention that [the claimant] Czarnecki twice fell off a ladder—demonstrating her incapacity to successfully climb ladders—and that she had to *stop* waitressing because of her pain and inability to meet the physical demands of the job") (emphasis in original). In addition to the above points, the ALJ did not give any serious consideration to plaintiff's claim that he had good days and bad days.

In her third credibility rationale—inconsistent treatment—the ALJ also failed to consider plaintiff's explanations. The ALJ faulted plaintiff for not pursuing options such as surgery for his back pain. But the ALJ failed to consider his testimony that he lacked insurance. Plaintiff raised this point multiple times at the hearing. *See* R. 56-57, 59. The ALJ gave no consideration to these explanations even though it is well-established that an ALJ has a duty to first ask a claimant about, and then explore a claimant's explanations regarding, treatment inconsistencies. *See, e.g., Pierce*, 739 F.3d at 1050 (an ALJ cannot "rely on an uninsured claimant's sparse treatment history to show that a condition was not serious without exploring why the treatment history was thin"). Also, the ALJ faulted plaintiff for "continu[ing] to smoke cigarettes despite repeated admonishments from doctors for him to cease." R. 17. But the ALJ ignored plaintiff's testimony that he had stopped smoking. In sum, the ALJ's credibility analysis rests on too many questionable inferences and unexplained gaps.

## III.  Medical Opinions

In the third part of the opinion, which is the shortest, the ALJ found that the opinions of the State Agency doctors—Dr. Arjmand, Dr. Hudspeth, and Dr. Andrews—deserved only "little weight." R. 18. Plaintiff argues that these opinions, if accepted, would have provided sufficient evidence to find that her impairments were severe at Step 2. The Government has not disputed this assertion, although it argues that these opinions would not necessarily support a broader finding that plaintiff was disabled under the later steps in the analysis. As noted above, this was not a case where the ALJ rejected a medical opinion by relying on competing medical opinions.

The ALJ provided only two cursory and vague rationales for rejecting this testimony. The first is that they were only "one-time snapshots of the record." R. 18.[4] The second is that these doctors did not "consider the entire record that was before [the ALJ] or the claimant's testimony." *Id.* But these are merely boilerplate assertions, ones that could be asserted against almost every Agency report. In this Court's experience, these reports are typically issued before the hearing such that the doctor would not have heard the claimant's testimony. As for the assertion that additional evidence was submitted after these reports, this is true in many cases as well. And the evidence here, according to plaintiff, is that the additional evidence just made her claims stronger; in particular, the second MRI confirmed the findings of the first. As the Seventh Circuit has noted, rejecting the opinions of Agency doctors generally requires a "good explanation." *See Beardsley v. Colvin*, 758 F.3d 834, 839, (7th Cir. 2014). The ALJ's twin boilerplate blasts here did not meet this standard.

---

[4] The Court is bemused by the ALJ's characterization of the State Agency doctors' opinions as being merely "one-time snapshots of the record." The Court has analyzed hundreds of ALJ opinions that rely on these types of State Agency doctors' "one-time snapshots of the record," even as the main basis to discredit a treating source's opinion, to deny benefits to applicants.

11

One final point about the opinion evidence is necessary. In addition to rejecting the State Agency doctors' opinions, the ALJ also stated generally that the record contained no "opinions from treating or examining physicians indicating that the claimant is disabled or even has limitations greater than those determined in this decision." R. 19. Plaintiff has not challenged this portion of the opinion, but the Court notes that the ALJ's claim seems to ignore the fact that, at a minimum, there was the report from Dr. Renzi diagnosing plaintiff with major depressive disorder. As noted above, this conclusion arguably conflicts with the finding of no severe impairment at Step 2.

Although this Court finds that the above errors are significant enough to remand this case, this Court does not dictate any particular result on remand because, despite the flaws in the ALJ's analysis, there are legitimate questions as to whether plaintiff's impairments are limiting enough to qualify as disabled under the complete five-step process. Regardless of the outcome, the evidence should be evaluated accurately, fairly, and thoroughly.

## CONCLUSION

For these reasons, plaintiff's motion for summary judgment is granted, the government's motion is denied, and the case is remanded to the Commissioner for further proceedings consistent with this opinion.

Date: November 1, 2016        By:  _____
                                   Iain D. Johnston
                                   United States Magistrate Judge